

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
05/24/2013

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Triumph Christian Center, Inc.,** | § | **Case No: 13-30623** |
| | § | |
| **Debtor.** | § | **Chapter 11** |

## MEMORANDUM OPINION RELATING TO FOUNDATION CAPITAL RESOURCES, INC.'S MOTION TO DISMISS FOR SERIAL FILING
[Doc. No. 14]

### I. INTRODUCTION

On February 4, 2013, Triumph Christian Center, Inc. (the Debtor) filed the instant Chapter 11 case. [Doc. No. 1]. The Debtor had previously been a debtor in a Chapter 11 case filed on December 7, 2010 [Case No. 10-41239, Doc. No. 1], and had obtained confirmation of its plan of reorganization in that case on August 23, 2011. [Case No. 10-41239, Doc. No. 66]. On February 11, 2013, Foundation Capital Resources, Inc. (FCR) filed its "Motion of Foundation Capital Resources, Inc. (FCR) to Dismiss for Serial Filing" (the Motion). [Doc. No. 14].

In the Motion, FCR seeks dismissal of the Second Case "for cause" pursuant to Federal Bankruptcy Rule 1017(f)(2) and 11 U.S.C. § 1112(b)(1). [Doc. No. 14, ¶ 8]. Specifically, FCR alleges that the Debtor has filed this second Chapter 11 case in bad faith, and therefore "cause" for dismissal exists under section 1112(b).[1] The Debtor contends that its serial filing of this second Chapter 11 case was necessitated by unanticipated changed circumstances, and therefore is not in bad faith.

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted.

On April 24, 2013, this Court held a hearing on the Motion. The Court heard testimony from one witness: the President of the Debtor, Pastor Ladell Graham. The Court also admitted FCR's exhibits one through ten and the Debtor's exhibits one through seventeen. For the reasons set forth herein, the Court finds that the Debtor's filing of the instant Chapter 11 case is an impermissible attempt to modify the plan in its prior Chapter 11 case, which has already been substantially consummated, in violation of section 1127(b) of the Bankruptcy Code. Further, the Debtor has not demonstrated unanticipated changed circumstances which would warrant this second Chapter 11 filing. For these reasons, and because of the presence of other indicators of bad faith, the Court finds that there is cause for dismissal under section 1112(b)(1). Therefore, the Motion should be granted.

The Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9014 and Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052.[2]

## II.   FINDINGS OF FACT

1. The Debtor filed its first Chapter 11 case on December 7, 2010 (the First Case). [Case No. 10-41239, Doc. No. 1]. The Debtor is a non-profit ministry located in the City of Rosenberg, Fort Bend County, Texas. [Apr. 24, 2013 Tr. 5:7–8]. The Debtor has approximately five hundred congregates. [*Id.* at 5:14–15].

2. FCR is engaged in lending to faith-based organization such as churches. In December of 2008, FCR loaned the Debtor $2,433,500.00 for the purpose of building a new worship center. As part of the loan transaction, the Debtor granted FCR a security interest in its

---

[2] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

twenty-three acres of real property and improvements thereon located in the City of Rosenberg, Fort Bend County, Texas (the Property). The security interest was granted and is memorialized in "that one certain Deed of Trust, Assignment of Leases and Rents and Security Agreement dated December 10, 2008, recorded under Fort Bend County Clerk's File No. 2008127989, in the Official Public Records of Real Property of Fort Bend County, Texas" (the Deed of Trust). *See* [FCR's Ex. 4].

3. In the First Case, on August 23, 2011, this Court confirmed a plan of reorganization filed by the Debtor (the Plan). [Case No. 10-41239, Doc. No. 66]. The Plan was a heavily negotiated consensual plan, and the confirmation order was signed by counsel for the Debtor, counsel for FCR, counsel for Fort Bend County, and counsel for the Internal Revenue Service. [*Id.*].

4. Under the Plan, FCR was the Class 1 claimant. [FCR's Ex. 1, p. 7]. The treatment was negotiated between the Debtor and FCR, and their respective counsel, and required the Debtor to execute a Modification Renewal and Extension Agreement which restructured the indebtedness owed by the Debtor to FCR (the Restructure Agreement). The Plan further provided that:

> Until the Allowed Class 1 Claim has been paid in full, the Holder of the Class 1 Claim [i.e., FCR] shall retain all liens, security interests and other rights provided in its deed of trust, security agreement and other loan documents except as otherwise specifically provided in the Plan. In addition to the foregoing treatment of the Allowed Class 1 Claim, such Claim may be modified, reduced, extended or paid in any manner to which the Holder of the Allowed Class 1 Claim and the Reorganized Debtor may agree in writing.

[*Id.* at pp. 8–9].

5. Pursuant to the Plan, the Debtor did, in fact, execute the Restructure Agreement. *See* [FCR's Ex. 3]. The Restructure Agreement contains the following language:

> Borrower and Lender agree that this Agreement modifies, renews and extends the Note and Security Instruments, but in no way acts as a release, satisfaction,

3

discharge, or relinquishment of any of the liens, security interests and rights securing payment of the Note, including without limitation, the liens created by the Security Instruments against the Property. Borrower and Lender expressly agree that the intent of this Agreement is to modify, renew and extend the terms of the Note and Security Instruments and shall not constitute and shall not be construed as a novation of the Note or Security Instruments. Except as expressly modified herein, the terms and provisions of the Note and Security Instruments shall remain in full force and effect. In the event of an inconsistency between this Agreement and the terms of the Note and Security Instruments, this Agreement shall govern.

[*Id.* at p. 3].

6. In September and October of 2011, the Debtor timely made the payments under the Restructure Agreement. [Debtor's Ex. 17]. However, beginning in November of 2011, the Debtor failed to timely make all of the payments required under the Restructure Agreement. [*Id.*].

7. On October 6, 2011, this Court entered an Order closing the First Case. [Case No. 10-41239, Doc. No. 89]; [FCR's Ex. 8].

8. In November of 2011, the Debtor began a building fund campaign to raise $65,000.00 for the purpose of completing what Pastor Graham refers to as "the Champion Center" (the Center). [Debtor's Ex. 6]. As a result of this campaign, the congregates giving to the ministry every Sunday declined as they gave instead to the building fund campaign. [Apr. 24, 2013 Tr. 14:9–18; 16:11–21]. The Plan did not mention the Debtor's plans to raise additional funds to put towards construction of the Center or what the cost of the additional construction would be. [FCR's Ex. 1]; [Case No. 10-41239, Doc. No. 53]. Nor did the disclosure statement which the Debtor filed in conjunction with the Plan. [Case No. 10-41239, Doc. No. 50].

9. In November of 2011, the Debtor also experienced an electrical power surge that resulted in the burning up of ten circuit commercial breakers. [Apr. 24, 2013 Tr. 20:17–24]. The cost of repairing and replacing these breakers was $5,850.00. [Debtor's Ex. 8].

10. In December of 2011, the five pastors who work at the ministry voluntarily took a ten percent pay cut. [Tape Recording, 04/24/2013 Hearing at 05:36:07–05:37:50 p.m.] Also, the Debtor replaced the paid children's minister with a volunteer, resulting in a savings of approximately $3,500.00 per month. [*Id.*].

11. The Debtor was leasing two mobile modular units from Mobile Modular Management Corporation. On September 26, 2012, Mobile Modular Management Corporation sent a demand letter to the Debtor setting forth that the Debtor was in default under the lease in the amount of $17,399.00, and that the modular units would be repossessed if payment was not made. [Debtor's Ex. 9]. In October of 2012, the Debtor paid $4,140.00 of this amount, and has been able to maintain possession of these units. [Apr. 24, 2013 Tr. 22:12–21].

12. On January 3, 2012, the Debtor entered into a construction contract with JTJ Builders, Inc. for the purpose of completing the Center (the Contract). [FCR's Ex. 10]. Article 15 of the Contract sets forth that the total amount to be paid by the Debtor was $753,760.00, with periodic payments to be made according to phases of work done by JTJ Builders, Inc. [*Id.*]. Pastor Graham was unable to testify as to the amount that the Debtor has paid so far to JTJ Builders, Inc. under the Contract.

13. In October of 2012, the Debtor had to replace an air conditioning unit, and the cost of doing so was $4,200.00. [Debtor's Ex. 10].

14. In November of 2012, the Debtor made no payment at all under the Restructure Agreement. [FCR's Ex. 9].

15. On November 28, 2012, FCR's counsel sent the Debtor a letter giving notice of default and setting forth that FCR was accelerating the maturity of the promissory note, the payments of which had been restructured pursuant to the Restructure Agreement. [FCR's Ex. 4]. This

letter also set forth that the total amount now due and payable was $2,923,924.40. [*Id.*].
Finally, the letter enclosed a Notice of Substitute Trustee Sale setting forth that foreclosure of
the Property would occur pursuant to the Deed of Trust on January 1, 2013. [*Id.*]. At the
hearing on the Motion held on April 24, 2013, Pastor Graham testified that the Debtor had
paid FCR $197,000.00 under the Restructure Agreement and conceded that the amount
which the Debtor was required to have paid was $236,000.00. [Apr. 24, 2013 Tr. 28:13–16;
40:5–41:4].

16. In December of 2012, the Debtor made no payment at all under the Restructure Agreement.
    [FCR's Ex. 9].

17. On December 26, 2012, the Debtor filed suit against FCR in the District Court of Fort Bend
    County, Texas and obtained a temporary restraining order preventing FCR from going
    forward with the foreclosure sale scheduled on January 1, 2013. [FCR's Exs. 5 & 6]. The
    temporary restraining order set a hearing for January 8, 2013 to determine whether the
    temporary restraining order should be made a temporary injunction. [FCR's Ex. 6].

18. The Debtor passed the hearing on January 8, 2013, the temporary restraining order expired,
    and there is no temporary injunction in place. [Doc. No. 31, p. 6].

19. On January 8, 2013, FCR's counsel sent the Debtor a letter once again enclosing a Notice of
    Substitute Trustee Sale setting forth that foreclosure of the Property pursuant to the Deed of
    Trust would now occur on February 5, 2013. [FCR's Ex. 7].

20. In January of 2013, the Debtor made no payment at all under the Restructure Agreement.
    [FCR's Ex. 9].

21. On February 4, 2013—one day before the scheduled foreclosure—the Debtor filed its second Chapter 11 petition, thereby initiating the Chapter 11 case presently pending in this Court (the Second Case). [Case No. 13-30623, Doc. No. 1].

22. The Schedules filed by the Debtor in the Second Case reflect that the only new creditor in the Second Case is Mobile Modular Management Corporation in the amount of $12,908.00. [Case No. 13-30623, Doc. No. 1, p. 13]. All of the other creditors in the Second Case are the same creditors as in the First Case.[3]

23. On February 11, 2013, FCR filed a "Motion of Foundation Capital Resources, Inc. [FCR] to Dismiss for Serial Filing" (previously defined as the Motion). [Doc. No. 14]. The Debtor filed a response in opposition to the Motion on March 3, 2013. [Doc. No. 21]. On April 18, 2013, the Debtor filed a "First Amended Response and Objection to Motion to Dismiss and Request for Hearing." [Doc. No. 31].

24. On April 24, 2013, this Court held a hearing on the Motion. This Court heard testimony from one witness, Pastor Graham, and admitted exhibits of both parties.

25. On May 22, 2013, this Court heard closing arguments from counsel for FCR and counsel for the Debtor, and then took the matter under advisement. The Court now issues this Memorandum Opinion to explain why it will grant the Motion.

### III.   CREDIBILITY

One witness testified at the hearing: Pastor Graham. The Court finds that he was a credible witness and therefore gives considerable weight to his testimony.

---

[3] Although the Schedules filed in the Second Case list two additional creditors (in addition to Mobile Modular Management Corporation) that were not listed in the First Case—(1) the City of Rosenberg; and (2) Capital One, National Association—these creditors are listed as "notice only"; thus, the Court does not include them in this determination. [Doc. No. 1, pp. 12 & 16].

## IV.  CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it concerns the administration of the Debtor's estate; and it is also core pursuant to the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Venue is proper pursuant to 28 U.S.C. § 1408(1).

### B.  Constitutional Authority to Enter a Final Order

The Supreme Court's decision in *Stern v. Marshall* recognized certain limitations on bankruptcy courts' constitutional authority to enter final orders.  *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  Therefore, this Court has a duty to question its constitutional authority to enter a final order for any matter brought before it.  The Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that this Court has the authority to enter a final order on the Motion.  In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant.  *Id.*  Here, FCR seeks relief pursuant to Federal Bankruptcy Rule 1017(f)(2) and 11 U.S.C. § 1112(b).  As the Motion and the requested relief are based on an express provision of

8

the Code and an express Bankruptcy Rule, rather than on state law, this matter is distinguishable from the suit in *Stern*.  This Court is, therefore, constitutionally authorized to enter a final order on the Motion.

## C. The Debtor's Serial Filing Is an Impermissible Attempt to Modify a Plan that has Been Substantially Consummated.

FCR alleges that the instant Chapter 11 filing represents an attempt by the Debtor to impermissibly modify the Plan—which has already been substantially consummated[4]—in contravention of 11 U.S.C. § 1127(b).  *See* 11 U.S.C. § 1127(b) (providing that after confirmation, a plan may only be modified *before* substantial consummation occurs).  For its part, the Debtor argues that it did not file the Second Case to contradict or impermissibly modify the Plan, and further asserts that the following unanticipated changed circumstances justify the filing of the Second Case:  (1) an unforeseen drop in congregational contributions; (2) the unforeseen repair of electrical breakers; (3) the unforeseen rate increase and demand for payment under threat of repossession of the Mobile Modular buildings; and (4) the unforeseen repair of the air conditioning compressor.

"The mere fact that a debtor has previously petitioned for bankruptcy relief does not render a subsequent Chapter 11 petition '*per se*' invalid."  *See In re Elmwood Dev. Co.*, 964 F.2d 508, 511 (5th Cir. 1992) (finding that the Code itself contains no absolute bar against filing a second Chapter 11 petition).  However, a second Chapter 11 filing may contravene section 1127(b) of the Code, which prohibits modification of a confirmed plan of reorganization once the plan has been substantially consummated.  *Id.*  Thus, "a debtor generally should not be

---

[4] Under section 1101(2) of the Bankruptcy Code, "substantial consummation" means:
    (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
    (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
    (C) commencement of distribution under the plan.

Here, the parties do not dispute that the Plan has been substantially consummated.

9

permitted to go forward with a successive Chapter 11 reorganization case where it has defaulted on a confirmed, substantially consummated plan or reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan." *Matter of Savannah, Ltd.*, 162 B.R. 912, 915 (Bankr. S.D. Ga. 1993). "Where a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings." *In re Elmwood Dev. Co.*, 964 F.2d at 511.

Courts have allowed a limited exception where there are "unanticipated changed circumstances" which were "unknown at the time of the substantial consummation of the prior plan and must have substantially affected the debtor's ability to perform that plan." *Id.* (citing *In re Casa Loma Assocs.*, 122 B.R. 814, 818–19 (Bankr. N.D. Ga. 1991)). Where unanticipated changed circumstances exist, Chapter 11 relief may be justified even when obligations created under a previously confirmed, substantially consummated plan will be modified. *In re Elmwood Dev. Co.*, 964 F.2d at 512. The rationale is that, "[i]n that instance, a second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to accomplish the goals of bankruptcy relief." *Id.* at 511.

1. The instant Chapter 11 filing represents an attempt by the Debtor to impermissibly modify the Plan.

The Debtor is in default under the Plan and filed the Second Case, in part, to halt a foreclosure sale by FCR due to arrearages on the debt owed to it. [Doc No. 45, p.2]. As discussed above, section 1127(b) of the Code prohibits modification of a confirmed plan of reorganization once the plan has been substantially consummated. *See* 11 U.S.C. § 1127(b). Where a debtor has defaulted under a confirmed plan of reorganization, the debtor will generally

not be permitted to proceed with a second case if the second filing is merely an attempt to circumvent this rule. *Matter of Savannah, Ltd.*, 162 B.R. 912, 915 (Bankr. S.D. Ga. 1993). The Debtor asserts that its filing of the Second Case does not run afoul of these principles because: (1) no Plan provision precludes the Debtor from seeking to modify FCR's claim; and (2) under the Plan, FCR did not retain the right to foreclose; thus, the Debtor is not modifying this right. [Doc. No. 45, pp. 2]. The Court finds that the Debtor's arguments are unpersuasive; and that the Second Case is, in fact, an impermissible attempt by the Debtor to modify the Plan.

First, in its "Brief in Support of First Amended Response and Opposition to Motion to Dismiss," the Debtor asserts that it may modify its treatment of FCR's claim because "[t]here is no Plan provision or stipulation precluding the Debtor from seeking any further modification of [FCR's] claim." [Doc. No. 45, p. 2]. However, the plain language of the Plan reads as follows:

> Until the Allowed Class 1 Claim has been paid in full, the Holder of the Class 1 Claim [i.e., FCR] shall retain all liens, security interests and other rights provided in its deed of trust, security agreement and other loan documents except as otherwise specifically provided in the Plan. In addition to the foregoing treatment of the Allowed Class 1 Claim, such Claim may be modified, reduced, extended or paid in any manner to which the Holder of the Allowed Class 1 Claim and the Reorganized Debtor **may agree in writing**.

[Finding of Fact No. 4] (emphasis added). The confirmation order contains nearly identical language. *See* [FCR's Ex. 2, p. 4]. Thus, according to the Plan and confirmation order, FCR's claim may be modified *only if FCR and the Debtor agree in writing*.

There is no question that FCR has *not* agreed in writing—or, for that matter, orally—to a modification of its claim. Indeed, once the Debtor defaulted on its payments to FCR under the Plan [Finding of Fact Nos. 14 & 16], FCR accelerated the maturity of the note and posted the Property for foreclosure. [Finding of Fact Nos. 15 & 19]. To stop the foreclosure, the Debtor first obtained a temporary restraining order from the Fort Bend County District Court [Finding of

Fact No. 17]; but, when that Court did not thereafter issue an injunction [Finding of Fact No. 18], the Debtor filed its second Chapter 11 petition (initiating the Second Case) to prevent the scheduled foreclosure from proceeding. [Finding of Fact No. 21]. Under these circumstances, the Court finds that by filing the Second Case, the Debtor seeks to unilaterally modify FCR's claim in contravention of the Plan.

Further, the Debtor alleges that the Second Case does not contradict the First Case because "[t]here are no terms in the Confirmed Plan governing [FCR's] remedies in the event of default. For example, no rights were retained by [FCR], such as the right to foreclose if the stipulated payments were not made, or that the automatic stay would not apply to [FCR] in a succeeding bankruptcy case." [Doc. No. 45, p. 7]. However, as the Plan and confirmation order make clear, FCR retained "all liens, security interests and other rights provided in its deed of trust, security agreement and other loan documents . . . "[5] [FCR's Ex. 1, p. 8]; [FCR's Ex. 2, p. 4]. The right to foreclose, in turn, comes from the Deed of Trust. *See* [Finding of Fact Nos. 2, 15 & 19]. Although the payment terms were modified by the Restructure Agreement, the Plan makes clear that FCR retained the rights granted to it pursuant to its deed of trust, security agreement, and other loan documents—including the right to foreclose. Thus, contrary to the Debtor's assertion, the Second Case also seeks to modify FCR's bargained-for right to foreclose in the event of default under the Restructure Agreement.

From this discussion, it is clear that the Second Case represents an attempt by the Debtor to unilaterally modify rights that FCR negotiated for, and the Debtor agreed to, in the First Case. Stated differently, the Second Case does indeed contradict the First Case. The Second Case therefore runs afoul of the prohibition against modification of a substantially consummated plan

---

[5] The language of the Plan provides that these rights are retained "except as otherwise specifically provided in the Plan." [FCR's Ex. 1, p. 8]. Nowhere in the Plan is FCR's right to foreclose abrogated.

contained in section 1127(b) of the Code.  Thus, under applicable case law, the Second Case

must be dismissed unless the Debtor can prove that unanticipated changed circumstances exist

which permit the Debtor to proceed with the Second Case even though it seeks to alter or modify

FCR's rights under the Plan.  The Court now analyzes this issue.

2.  The Debtor has not demonstrated "unanticipated changed circumstances" which would justify the filing of the Second Case.

Although the Second Case would modify the Plan, this serial filing may still be justified

if unanticipated changed circumstances exist.  *In re Elmwood Dev. Co.*, 964 F.2d at 512.  The

Debtor bears the burden of proof of demonstrating an unanticipated change in circumstances

which would justify a serial Chapter 11 filing.  *In re Casa Loma Assocs.*, 122 B.R. at 818.

Subsequent filings have only been permitted in very unusual, almost extraordinary, factual

situations.  *Id.*; *In re Frank's Nursery & Crafts, Inc.*, Case No. 04-15826(PCB), 2006 Bankr.

LEXIS 1964, at *10 (Bankr. S.D.N.Y. May 8, 2006) (citing *In re Northtown Realty Co., L.P.*,

215 B.R. 906, 911 (Bankr. E.D.N.Y. 1998)).  Further, "[e]ven extraordinary and unforeseeable

changes will not support a new Chapter 11, if these changes do not substantially impair the

debtor's performance under the confirmed plan."  *In re Adams*, 218 B.R. 597, 601–02 (Bankr. D.

Kan. 1998).  The unanticipated changed circumstances must justify the debtor's default under the

first plan, while making reorganization under a second plan likely.  *In re Casa Loma Assocs.*,

122 B.R. at 819.

a.  *In a minority of cases, unanticipated changed circumstances sufficient to justify a serial Chapter 11 filing have been found.*

As there is no established bright-line test for determining when unanticipated changed

circumstances exist, this Court will first examine the relatively few cases that have found

unanticipated changed circumstances which have warranted a serial bankruptcy filing.  For

example, in *Casa Loma*, the court found that unanticipated changed circumstances justified a second Chapter 11 filing in a case where the debtor's market was substantially and detrimentally affected by a change in the law. *Id.* There, the debtor operated an adults-only apartment complex. *Id.* at 815–16. After the plan in the debtor's first Chapter 11 case had been substantially consummated, a federal law was enacted that prohibited discrimination against children as tenants. *Id.* As a result, the debtor suffered unexpected financial losses due to increased vacancies and higher operating costs associated with the admission of children into the complex. *Id.* at 816. Important were the facts that the law had substantially changed the debtor's ability to perform under the initial plan and that the change was unknown and not reasonably foreseen at the time the plan was substantially consummated. *Id.* at 819.

Likewise in *Bouy, Hall & Howard & Assoc.*, the court found that unanticipated changed circumstances warranted a second Chapter 11 filing where the debtor owned a motel near the airport and the departure of three airlines and relocation of two others caused a "fundamental change in its market." *In re Bouy, Hall & Howard & Assocs.*, 208 B.R. 737, 745 (Bankr. S.D. Ga. 1995). The court noted that "changed market conditions alone are not sufficiently changed circumstances to warrant a second filing." *Id.* However, under the facts of that case, the debtor was able to demonstrate "not only . . . that the demand for its service decreased, but also that the market itself had been significantly altered." *Id.*; *see also In re Deed & Note Traders, LLC*, No. AZ-11-1091-PaDJu, 2012 WL 1191891, at *8 (B.A.P. 9th Cir. Apr. 5, 2012) (noting that an "unanticipated collapse in the general availability of credit" was a sufficient changed circumstance, but that a general decline of the housing market was not).

Additionally, unanticipated changed circumstances sufficient to justify a debtor's serial Chapter 11 filing have been found where the debtor had amassed a significant amount of new

debt after the initial Chapter 11 plan was substantially consummated; thus, the court found that the second filing was not an attempt to modify the prior plan after substantial consummation had occurred. *In re Garsal Realty, Inc.*, 98 B.R. 140, 149 (Bankr. N.D.N.Y. 1989). Similarly, in a case where a substantial adverse judgment was entered against the debtor after substantial consummation of the debtor's first plan of reorganization, the court found this was an unanticipated changed circumstance and that the debtor's "only way . . . to prevent [enforcement of the judgment] from occurring was to file the second Chapter 11 case." *In re Woodson*, 213 B.R. 404, 406 (Bankr. W.D.N.Y. 1997). In another case, unanticipated changed circumstances were found where "[a] wide spread range fire . . . burned 3,000 acres of [the debtor's] 8,000 acres of ranch and cropland," along with part of his cattle herd. *In re Adams*, 218 B.R. at 602. The court found that not only was the fire and resulting damage unanticipated, but it substantially impaired the debtor's ability to perform under the plan by causing him to lose income and expend significant sums of money on repairs. *Id.*

     *b.  A majority of cases have declined to find that the debtor's alleged unanticipated changed circumstances rise to a level sufficient to justify a serial bankruptcy filing.*

Now that the Court has considered the instances in which courts have found unanticipated changed circumstances justified a debtor's serial filing, it considers other cases in which the alleged unanticipated changed circumstances were insufficient to justify the debtor's serial filing. The Fifth Circuit, in one of the earliest cases to address this issue, concluded that none of the following factors were sufficient to justify a serial Chapter 11 filing by a debtor whose main asset was an office building: (1) tenants moving into a vacant floor of the building; (2) a settlement agreement with another creditor wherein the creditor agreed to accept a smaller share of funds than it was otherwise entitled to; (3) the identification of a prospective buyer; (4) pending litigation among two of its creditors to resolve lien priority; and (5) a nation-wide

"credit crunch." *In re Elmwood Dev. Co.*, 964 F.2d at 512. The Court found that, under the circumstances of that case, all these factors were not only foreseeable at the time of the debtor's first Chapter 11 case, but in fact were expected by the debtor. *Id.*

A string of cases decided shortly after *Elmwood* shed further light on what facts do *not* constitute unanticipated changed circumstances. In a case where the debtor owned and operated an office building, it alleged that the following were unanticipated changed circumstances: (1) mismanagement due to the property manager's drug use; (2) repairs to the roof and air conditioner; (3) the principal balance of a debt coming due; and (4) a decline in the market for office space. *In re Mableton-Booper Assoc.*, 127 B.R. 941, 942 (Bankr. N.D. Ga. 1991). The court rejected all of these arguments and found that, as to the first three, they were all foreseeable at the time the first plan was confirmed. *Id.* at 944. As to the last argument, the court noted that changed market conditions alone are insufficient to constitute unanticipated changed circumstances. *Id.* (citing *Casa Loma*, 122 B.R. at 818).

Additionally, where the debtor operated a building that leased space to a restaurant, the court found that "the fact that a tenant operating a new restaurant/bar may not succeed is clearly a foreseeable event." *In re Roxy Real Estate Co.*, 170 B.R. 571, 576 (Bankr. E.D. Pa. 1993). Similarly, in *In re Savannah*, the court noted that the following were insufficient changed circumstances: (1) the opening of a competing business, where the debtor knew at the time of plan confirmation that the business was being constructed; (2) repairs amounting to "only $9,000.00 more than the estimated cost of anticipated repairs;" (3) a decline in business where the debtor had previously relied on military business but knew at the time of plan confirmation that the war had ended; and (4) the breakdown of an electronic sign situated along the highway that helped attract business to the property. *In re Savannah, Ltd.*, 162 B.R. 912, 915–16 (Bankr.

S.D. Ga. 1993).   Another court found that "the emergence of several potential buyers for the [d]ebtor's assets, legal developments . . . , [and] a pending foreclosure action" were all insufficient changed circumstances because they were foreseeable at the time the debtor's first chapter 11 plan was confirmed.   *In re Del. Valley Broads. Ltd.*, 166 B.R. 36, 40 (Bankr. D. Del. 1994).   Finally, in *In re Northtown Realty Co.*, the court found that "a decline in [a retail shopping center's] occupancy rate due to a rash of retail bankruptcies among several of its tenants" was insufficient to constitute unanticipated changed circumstances.   *In re Northtown Realty Co.*, 215 B.R. 906, 913 (Bankr. E.D.N.Y. 1998)

More recent cases have continued to shed light on the analysis of what constitutes unanticipated changed circumstances which justify a serial Chapter 11 filing.   For example, one case held that "the economic fallout from the [September 11, 2001] attacks do not constitute an unforeseeable change in circumstances" where the debtor's plan of reorganization was formulated prior to September 2001, but was not approved until June of 2002.   *In re Motel Properties, Inc.*, 314 B.R. 889, 896–97 (Bankr. S.D. Ga. 2004).   Additionally, a number of cases have addressed this issue in light of the recent economic downturn.   In *In re Woods*, for example, the court concluded that the inability to refinance a mortgage does not constitute an unanticipated change of circumstances.   *In re Woods*, No. 10-12397, 2011 WL 841270, at *4 (Bankr. D. Kan. Mar. 7, 2011).   Similarly, in *In re Caviata Attached Homes, LLC*, the court found that a decline in the economy, followed by the real estate and lending markets not recovering, were not unanticipated changed circumstances.   *In re Caviata Attached Homes, LLC*, 481 B.R. 34, 50 (B.A.P. 9th Cir. 2012).   Finally, this Court had occasion to consider the issue in *In re McMahan*, where it concluded that the inability to sell property was neither an unpredictable, nor an

unanticipated, changed circumstance. *In re McMahan*, 481 B.R. 901, 919 (Bankr. S.D. Tex. 2012).

    *c.* *Comparison of the above-discussed cases to the circumstances in the instant case.*

In the case at bar, the Debtor's first argument is that a reduction in monthly tithing contributions constitutes an unanticipated changed circumstance which warrants the filing of the Second Case. Specifically, in November of 2011—a mere three months after the Plan was confirmed [Finding of Fact Nos. 3 & 8]—the Debtor initiated a building fund campaign to raise $65,000 to complete the Center. [Finding of Fact No. 8]. As a result of this campaign, regular contributions decreased for the months of November and December of 2011 and January of 2012. [*Id.*]. The Debtor contends that "[i]t was not anticipated that the members would reduce their monthly contributions as they responded to the request for the special building fund offering." [Doc. No. 31, p. 2].

The Court finds that the decrease in contributions is not an "unanticipated changed circumstance" which justifies the Debtor's successive Chapter 11 filing. First, these facts do not rise to the level of unusual or extraordinary circumstances which courts have found were sufficient to constitute unanticipated changed circumstances. The temporary drop in contributions is akin to a mere market fluctuation, which is insufficient to constitute unanticipated changed circumstances. It is distinguishable from a permanent or prolonged fundamental change, like the change of the law in *Casa Loma* or the fundamental market change in *Bouy, Hall & Howard & Assoc.*, both of which did constitute unanticipated changed circumstances.

Also important is the fact that the decrease in tithing contributions was caused not by some outside, unexpected force, but rather by the Debtor's own actions. "Those courts which

construe that second chapter 11 filings may be in good faith, despite the terms of an earlier confirmed plan, consistently hold that the default in the first plan cannot be attributed to events caused by the debtor, events which were known at the time of confirmation, or events which are generally foreseeable." *In re Roxy Real Estate Co., Inc.*, 170 B.R. 571, 576 (Bankr. E.D. Pa. 1993). Here, by asking its congregates to give to a building campaign, it was reasonably foreseeable that the congregates might then give less to the general fund. This is true regardless of the fact that the Debtor asked its congregates to donate above and beyond what they would normally give. It should have been foreseeable to the Debtor that some of its congregates would only have limited funds to give, and might therefore divert funds that they normally would have given as general contributions to the special building project.

Further, the Debtor began soliciting contributions for the special building project a mere three months after the Plan was confirmed. [Finding of Fact Nos. 3 & 8]. Yet, at the time of confirmation of the Plan, the Debtor knew that the Center was not fully constructed. If the Debtor intended to expend additional sums on construction, it could have—and should have— provided for these expenditures in the Plan. For these reasons, the Court finds that the changed circumstance of the decrease in tithing contributions does not constitute an unanticipated changed circumstance which would justify the filing of the Second Case.

Similarly, the Debtor's argument that the so-called "unforeseen" rate increase and demand for payment on two leased Mobile Modular buildings was an unanticipated changed circumstance also fails. Not only was the rate increase foreseeable, but it was likely avoidable. The Debtor, having entered into a lease agreement with Mobile Modular Management Corporation in the first place, had knowledge of the terms of that lease agreement. This includes

knowledge of when the lease term was set to expire.  It should have come as no surprise to the Debtor that holding over past the expiration of the lease term would result in a rate increase.

Indeed, this is an entirely foreseeable result, and one which the Debtor likely could have prevented by remaining cognizant of the terms of the lease and negotiating a new lease agreement with Mobile Modular Management Corporation when the previous term expired. Under these circumstances, it is also foreseeable that Mobile Modular Management Corporation would demand payment of any unpaid, past due amounts, and seek to repossess the Mobile Modular buildings if these amounts were not paid.  [Finding of Fact No. 11].  While the rent increase, demand for payment, and threat of repossession of the Mobile Modular buildings may not have been known at the time the Plan was confirmed, these circumstances were all caused by the Debtor's own failure to be aware of the terms of its own lease agreement, and are all generally foreseeable results in light of this failure. *See In re Roxy Real Estate Co., Inc.*, 170 B.R. 571, 576 (Bankr. E.D. Pa. 1993).   Therefore, this Court finds that none of these circumstances constitute unanticipated changed circumstances which would warrant the filing of the Second Case.

Finally, the Debtor alleges that unforeseen repairs—specifically, the repair of electrical breakers that were damaged due to a power surge in November of 2011 at a cost of $5,850.00 [Finding of Fact No. 9] and the repair of an air conditioning compressor that overheated in October of 2012 at a cost of $4,200.00 [Finding of Fact No. 13]—constitute additional unanticipated changed circumstances so as to justify its second Chapter 11 filing.  Yet, in a similar case where the debtor argued that $42,000.00 worth of repairs constituted unanticipated changed circumstances, the court expressly rejected this argument. *Matter of Savannah*, 162 B.R. at 915.  The court noted that "none of these repairs are extraordinary in the sense that all of

them are for maintenance or repair of equipment and fixtures which are recognized to have a limited life expectancy such as cash registers, microwave oven, air conditioning units, wide screen television, electronic signs, and so forth." *Id.* Thus, "although the specific repairs may not have been anticipated, [d]ebtor must have anticipated continuing maintenance and replacement expenses." *Id.* at 916.

Similarly here, although the Debtor might not have anticipated having to repair the electrical breakers and the air conditioning unit in particular, the Debtor should have anticipated some repair and replacement expenses. This is particularly true where, as here, the repairs were to the type of equipment that is recognized to have a limited life expectancy. For these reasons, the Court finds that the repairs to the electrical breakers and the air conditioning compressor do not constitute unanticipated changed circumstances. Rather, the Debtor should have anticipated having to make some repairs and budgeted for them in the Plan so that the costs of these repairs would not detrimentally affect the Debtor's ability to perform under the Plan.

In sum, the Debtor has failed to meet its burden of demonstrating unanticipated changed circumstances. *See In re Casa Loma Assocs.*, 122 B.R. at 818. To the contrary, the repair costs, the decrease in tithing contributions, and the rate increase and demand for payment on two leased Mobile Modular buildings are all attributable "to events caused by the debtor, events which were known at the time of confirmation, or events which are generally foreseeable." *In re Roxy Real Estate Co., Inc.*, 170 B.R. 571, 576 (Bankr. E.D. Pa. 1993). Under these circumstances, bad faith may be inferred. *See, e.g., In re Mableton-Booper Assoc.*, 127 B.R. 941, 944 (holding that bad faith may be inferred where a "debtor can anticipate the changed circumstances before confirmation of the first plan and later files a second petition to relieve itself of its obligations

under the prior plan."). The fact that there are no unanticipated changed circumstances necessitating the filing of the Second Case indicates that it was filed in bad faith.

**D. Other Factors Indicating that the Filing is not in Good Faith.**

There is no precise test for determining whether a serial petition was filed in good faith; however, the Fifth Circuit in *Little Creek* discussed factors that indicate a lack of good faith which serve to guide this Court's analysis. *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072–73 (5th Cir. 1986); *see also In re Scotia Pacific Co., LLC*, 508 F.3d 214, 223 (5th Cir. 2007) (applying the *Little Creek* factors post-enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005). These factors include whether: "(1) the debtor has one asset, which is a tract of real property; (2) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors; (3) the debtor has few employees; (4) the property is the subject of a foreclosure action as a result of arrearages on the debt; (5) the debtor's financial problems involve essentially a dispute between the debtor and a secured creditor which can be resolved in a pending state court action; and (6) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights." *In re McMahan*, 481 B.R. 901, 915–16 (Bankr. S.D. Tex. 2012) (citing *In re Little Creek Dev. Co.*, 779 F.2d at 1072–73).

FCR argues that the presence of some of these factors is yet a further indication that the Debtor's filing of the Second Case is not in good faith. [Doc. No. 14, pp. 5–7]. The Debtor "vigorously disputes this conclusion," arguing instead that the *Little Creek* factors do not support a finding of bad faith. [Doc. No. 45, pp. 4–7]. This Court will now discuss the application of the *Little Creek* factors to the dispute at bar.

**One Asset.** Whereas the Debtor in *Little Creek* had one asset, which was a tract of real property, here the Debtor also has some personalty. Still, the value of the Debtor's personal property is relatively small (i.e., the Debtor's Schedules list its personal assets consisting of equipment and supplies as having a value of $126,838.00) compared to the value of the Debtor's main asset, which is its twenty-three acres of land and three improvements (which the Debtor's schedules value at $4,800,000.00). [Debtor's Ex. 3, pp. 6 & 10]. Thus, this factor leans slightly in favor of a finding of bad faith.

**Few Unsecured Creditors.** The Debtor has disclosed a total of six unsecured creditors with claims totaling $91,843.26. [Debtor's Ex. 3, pp. 1 & 14–16]. By way of comparison, the Debtor scheduled total secured debts amounting to $2,947,332.87, $2,923,924.40 of which represents FCR's claim. [*Id.* at pp. 112–13]. Thus, the Debtor's unsecured debt is only three percent of the total debt amount. By way of comparison, FCR is owed nearly ninety-seven percent of the total debt. The fact that the Debtor's unsecured debt is very small in comparison to the amount owed to FCR leans strongly in favor of a finding of bad faith.

**Few Employees.** The Debtor has a total of twelve employees, five of whom are pastors and seven of whom handle membership, office management, maintenance, accounting, and coordination of worship services. Twelve employees is more than a "few" employees; thus, this factor does not support a finding of bad faith.

**Subject of a Foreclosure Action.** *Little Creek* identified the following factor as indicative of bad faith: "[t]he property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court." *In re Little Creek Dev.*, 779 F.2d at 1073. The facts in the instant case fit this element exactly. FCR first posted the Property for a foreclosure sale to take place on

January 1, 2013. [Finding of Fact No. 15]. The Debtor was able to obtain a temporary restraining order halting this foreclosure from the District Court of Fort Bend County, Texas. [Finding of Fact No. 17]. However, the Debtor declined to go forward and attempt to obtain an injunction at the state court hearing scheduled for January 8, 2013. [Finding of Fact No. 18]. Thus, the temporary restraining order expired and FCR again posted the property for a foreclosure sale to occur on February 5, 2013. [Finding of Fact Nos. 18 & 19]. The Debtor then filed the Second Case on February 4, 2013—one day before the scheduled foreclosure. [Finding of Fact No. 21]. Thus, this factor strongly favors a finding of bad faith.

**Two-party dispute.** Here, FCR is owed ninety-seven percent of the Debtor's total debt and over ninety-nine percent of the secured debt. [Debtor's Ex. 3, pp. 1, 14–16 & 112–113]. Thus, while the Debtor does have some other creditors, this is overwhelmingly a dispute between FCR and the Debtor over the Property, on which FCR holds its lien. Therefore, this factor weighs strongly in favor of a bad faith finding.

**Timing of Filing.** The Debtor filed the Second Case on February 4, 2013, on the eve of a foreclosure which was scheduled to take place on February 5, 2012. [Finding of Fact No. 21]. The Debtor had chose not to try to obtain an injunction in state court to halt the foreclosure [Finding of Fact No. 18], and admitted to filing the Second Case, in part, to stop FCR's foreclosure of the Property. [Doc. No. 45, p. 2]. As the timing of the filing of the Second Case evidences an intent to delay or frustrate the legitimate efforts of FCR to enforce the rights it bargained for and preserved under the Plan, this factor also leans strongly in favor of a finding of bad faith.

In conclusion, the presence of five of the six *Little Creek* factors is evidence that the Debtor filed the Second Case in bad faith. Most important is the fact that this is essentially a

two-party dispute between the Debtor and FCR, which holds ninety-seven percent of the Debtor's total debt, as well as a dispute that was already in litigation in state court when the Debtor initiated the Second Case. [Finding of Fact No 17]. Indeed, it was the Debtor who initiated the suit in state court after the Debtor defaulted under the Plan and FCR posted the Property for foreclosure. The Debtor thus chose its forum to stop the foreclosure, and there is no good reason why the Debtor should now be allowed to further forum shop by filing the Second Case and looking to this Court for protection. As the Debtor noted in its own brief, the suit in Fort Bend County District Court is still pending [Doc. No. 31, p. 6], and the Debtor, after this Second Case is dismissed, can certainly return to that forum to seek the injunction that it could have pursued, but chose not to, on January 8, 2013.

For all of the reasons discussed above, the Court concludes that under *Little Creek*, there is also cause for dismissal under section 1112(b) of the Code due to the Debtor's bad faith in filing the Second Case.

## E. The Debtor has Not Demonstrated Unusual Circumstances Which Would Establish that Dismissal is Not in the Best Interests of Creditors

Although FCR has established cause for dismissal under 11 U.S.C. § 1112(b)(1), and although the Debtor has failed to establish unanticipated changed circumstances, this Court may not dismiss the case if the Debtor can satisfy the elements of the "unusual circumstances" test set forth in 11 U.S.C. § 1112(b)(2).[6]  Here, however, the Debtor has failed to meet its burden of

---

[6] Section 1112(b)(1) allows for dismissal for cause "[e]xcept as provided in paragraph (2) and subsection (c) . . . " Subsection (c) is not applicable here, but subsection (2) arguably could be. Subsection (2) provides as follows:
    The court may not convert a case under this chapter to a cases under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title . . . and
(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

demonstrating that "unusual circumstances" exist such that dismissal is not in the best interests of the creditors and the estate.  See 11 U.S.C. § 1112(b)(2); 7-1112 COLLIER ON BANKRUPTCY ¶ 1112.05[2].

Bankruptcy courts have significant discretion in making the determination as to whether there are unusual circumstances that should prevent dismissal.  *In re 1031 Tax Group, LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007).  "Although a finding of unusual circumstances is within the court's discretion, the word 'unusual' contemplates facts that are not common to chapter 11 cases generally."  7-1112 COLLIER ON BANKRUPTCY ¶ 1112.05[2] (citing *In re Pittsfield Weaving Co.*, 393 B.R. 271, 274 (Bankr. D.N.H. 2008)).  "A determination of the existence of 'unusual circumstances' is necessarily fact intensive."  *Id.*

Unusual circumstances have been found where a debtor accrued post-petition debt as a result of the unexpected loss of a key customer and where the debtor's trade creditors assumed the risk of continuing losses by continuing to deal with the debtor.  *In re Pittsfield Weaving Co.*, 393 B.R. at 275.  In another case, a court found that the filing of a plan which proposed to pay all creditors in full as of the effective date of the plan constituted an "unusual circumstance" preventing dismissal.  *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008).

However, given the record before this Court, the Debtor has failed to prove unusual circumstances.  This is not a case where the Debtor has accrued unexpected post-petition debt and where the Debtor's creditors have assumed a risk of continuing losses by continuing to deal with the Debtor.  Indeed, here, FCR's attempts to foreclose unambiguously indicate that the Debtor's largest creditor does *not* want to assume the risk of the Debtor continuing to have cash flow problems resulting in monetary defaults to FCR.  Additionally, unlike the debtor in *Orbit*

---

(i)   for which there exists a reasonable justification for the act or omission; and
(ii)  that will be cured within a reasonable period of time fixed by the court.

*Petroleum*, the Debtor here has not filed a plan which proposes to pay all creditors in full as of the effective date; indeed, the Debtor has filed no plan whatsoever.  Finally, even if this Court found that there were "unusual circumstances" establishing that dismissal of this case would not be in the best interests of the Debtor's creditors,[7] the Debtor has not proven the additional elements required under section 1112(b)(2).  Thus, this dispute does not fall into the exception of section 1112(b)(2), and dismissal is appropriate.

## V.    CONCLUSION

While the filing of a second Chapter 11 case is not *per se* barred, here, the Debtor has not met its burden of showing unanticipated changed circumstances which would justify the filing of the Second Case.  The circumstances which the Debtor alleged were unanticipated—namely, a decrease in congregational contributions, repairs, and a rate increase and demand for payment on two leased buildings—were all, in fact, foreseeable.  Because the Debtor's filing of the Second Case is an impermissible attempt to modify the Plan, which has already been substantially consummated, and because there are no unanticipated changed circumstances, there is cause for dismissal under section 1112(b).  Further, the presence of five of the six *Little Creek* factors supports a finding of bad faith, which, in turn, is also cause for dismissal under section 1112(b).  Finally, the Debtor has failed to establish the elements of the "unusual circumstances" test.  Therefore, for all of these reasons, the Court finds that the Motion should be granted.

---

[7] The Court is acutely aware that the Debtor is a religious entity whose existence and activities may well—and probably do—benefit the surrounding community.  However, such circumstances do not constitute "unusual circumstances."  Section 1112(b) expressly links "unusual circumstances" to "the best interests of creditors and the estate," not to the best interests of the community at large.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed this 24th day of May, 2013.

Jeff Bohm
Chief United States Bankruptcy Judge